UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TUAN QUOC LE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:15-cv-30157-KAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER
(Dkt. Nos. 16 & 27)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

Before the court is an action for judicial review of a final decision by the Acting

Commissioner of the Social Security Administration ("Commissioner") regarding an individual's

entitlement to Social Security Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3).  Plaintiff Tuan Quoc Le

("Plaintiff") asserts that the Commissioner's decision denying him such benefits -- memorialized

in a May 16, 2014 decision of an administrative law judge ("ALJ") -- is not supported by

substantial evidence.  Specifically, Plaintiff alleges that the ALJ committed three errors by

failing to:  (1) undertake a function-by-function analysis of Plaintiff's ability to sit and stand; (2)

elicit a reasonable explanation for the apparent conflict between the Dictionary of Occupational

Titles ("DOT") and the testimony of the Vocational Expert ("VE"), in violation of Social

Security Regulation ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000); and (3) incorporate

1

Plaintiff's limitations in concentration, persistence, or pace into his Residual Functional Capacity ("RFC").  Plaintiff has filed a motion to reverse or remand (Dkt. No. 16) and the Commissioner, in turn, has moved to affirm (Dkt. No. 27).  Plaintiff responded to the Commissioner's motion (Dkt. No. 29).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will ALLOW the Commissioner's motion to affirm and DENY Plaintiff's motion to reverse and remand.

II.    FACTUAL BACKGROUND

Plaintiff completed the twelfth grade in Vietnam before coming to Massachusetts in 1990 or 1991 (Administrative Record ("A.R.") at 28).  He worked full-time for about eighteen years manufacturing computer cables (*id.* at 29-30).  Because his health prevented him from performing the job, which required him to stand for a substantial amount of time and to lift fifty pounds of weight, he stopped working in January 2012 when he was 48 years old (*id.* at 31, 74, 193, 226).  In his applications for DIB and SSI, Plaintiff alleged that he was disabled due to peripheral neuropathy in his feet and lower legs related to Type II diabetes mellitus ("DM"),[1] hyperlipidemia, fatty liver, and depression (*id*. at 13, 63, 226).

III.    PROCEDURAL BACKGROUND

---

[1] "Peripheral neuropathy (also known as sensorimotor neuropathy), nerve damage that affects the feet, legs, or hands, can cause pain, numbness, and tingling in toes, feet, legs, hands, and arms, which may subsequently cause difficulty walking and holding onto objects.  A loss of sensation, combined with poor blood circulation, makes it common for a person with DM and neuropathy to be unaware of an injury to a lower extremity, where cuts or blisters can turn into ulcerations. The ulcerations may become infected and have difficulty healing.  Complications of these ulcerations can include cellulitis (a painful inflammation of the skin and tissues, usually from an infection), gangrene (decomposing soft tissue that often results in amputation), and sepsis (an infection that spreads through the blood stream, potentially causing shock, widespread organ failure, or death)."  SSR 14-2P, 2014 WL 2472008, at *4 (June 2, 2014).

Plaintiff applied for DIB and SSI on December 4, 2012 alleging an onset of disability on October 19, 2012 (*id*. at 192, 200).  The applications were denied initially and upon reconsideration (*id*. at 90-93).  Following a hearing on May 8, 2014, the ALJ issued his decision eight days later finding Plaintiff was not disabled (*id.* at 7, 18, 19).  The Appeals Council denied review (*id.* at 1-3).  This appeal followed.

IV.   DISCUSSION

A.   Legal Standards

1.   Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for a rehearing.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law de novo, but must defer to the ALJ's findings of fact if they are supported by substantial evidence.  *See id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).  "Complainants face a difficult battle in challenging the Commissioner's determination because, under the substantial evidence standard, the [c]ourt must uphold the Commissioner's determination, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'"  *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 159 (D. Mass. 2010) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3

3

(1st Cir. 1987)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Irlanda Ortiz,* 955 F.2d at 769. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen*, 172 F.3d at 35.

        2.      <u>Standard for Entitlement to Social Security Disability Insurance Benefits and Supplemental Security Income.</u>

In order to qualify for DIB, a claimant must demonstrate that he was disabled within the meaning of the Social Security Act (the "Act") prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A), (D).  SSI benefits, on the other hand, require a showing of both disability and financial need.  *See* 42 U.S.C. § 1381a.  "Plaintiff's need, for purposes of SSI, and insured status, for purposes of [DIB], are not challenged.  The only question is whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability." *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is considered disabled under the Act

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in regulations promulgated under the Act. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id*; *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. §§ 404.1520, 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can do other work. *See id.* "The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374187, at *2 (July 2, 1996).  "Work-related mental activities generally . . . include the abilities to:  understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to

supervision and co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374187, at *6.  Put another way, "[a]n individual's RFC is defined as 'the most you can still do despite your limitations.'" *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20 C.F.R. § 416.945(a)(1)).

The claimant has the burden of proof through step four of the analysis.  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding impairment(s).  *See Goodermote*, 690 F.2d at 7.

B.  <u>Medical Records</u>

1.  Physical condition.

Plaintiff presented the ALJ and the court with medical records that spanned the period from February 2011 through March 2014.  Hampden County Physician Associates ("HCPA") and Springfield Medical Associates ("SMA") treated Plaintiff for DM, hyperlipidemia, fatty liver, and depression.  Plaintiff received diabetes counseling at the Mercy Medical Center (*see, e.g.* A.R. at 342).  J. Harry Courniotes II, M.D. treated Plaintiff's recurring onchyomycosis (toenail fungus) (*see, e.g., id*. at 308-09).  Details of these records will be included in the discussion of Plaintiff's objections.

2.  Mental condition.

Victor Carbone, Ph.D., of the Massachusetts Rehabilitation Commission's Disability Determination Services, examined Plaintiff on May 8, 2013 and on October 1, 2013 (*id*. at 372-375, 430-434).  After the initial assessment, Dr. Carbone diagnosed Plaintiff with "[d]epressive [d]isorder not otherwise specified," and assigned a Global Assessment of Functioning ("GAF") score of 62 (*id*. at 375).  Plaintiff returned to Dr. Carbone in October 2013 for an organic assessment (*id*. at 430).  Testing was restricted due to Plaintiff's limited ability to speak English

and his lack of knowledge of the "American alphabet" (*id.*).  Dr. Carbone, again, diagnosed

depression as Plaintiff's "major issue" (*id.* at 434).  In addition, testing revealed borderline

intellectual functioning and above-average visuomotor integration skills as reflected by his

performance on the Bender Visuomotor Gestalt Test – II (*id.*).  Plaintiff's GAF score remained at

62 (*id.*).

  C. <u>The ALJ Hearing</u>.

   Plaintiff and independent VE Mike Vidal testified before the ALJ (*id.* at 20).  Plaintiff

had taken medication for DM for six years (*id.* at 49-50).  He described his physical conditions

related to DM:  he was unable to sit or stand for more than one hour due to the numbness and

pain in his feet; he napped seven to ten times each day; and his vision was blurry (*id.* at 32-33,

37-38, 40-43, 50-51).  Plaintiff illustrated his foot pain and numbness by describing his inability

to feel injuries and his need to wear sandals, even in winter, due to the discomfort caused by

shoes and socks (*id.* at 43-48).  He indicated that he smoked half a pack of cigarettes a day,

despite doctors' advice to quit, and that he did not comply with medical treatment because

medication and doctors' advice did "not help [him] at all" (*id.* at 34-36, 49).[2]

   The VE testified about jobs that were consistent with job descriptions in the DOT (*id.* at

54).  According to the VE, Plaintiff's previous job was "skilled" (*id.* at 55).  The ALJ posed the

following hypothetical:

> Let's assume we are dealing with a person . . . who is going to be 50 in December, the
> education and the past work history, who is capable of light work, who would require a
> job where he could sit and stand for as long and as frequently as he wanted to, where the
> instructions he would carry out would be no more than simple ones, and where he had no
> more than occasional fine vision acuity requirements.  In other words, reading small
> print, manipulating small objects.  That could be no more than occasional, no more than
> three hours out of an eight hour day.  So, again my requirements here are light, sit, stand

[2] Plaintiff's attorney told the ALJ that "[n]oncooperation is definitely [a]n issue in this case . . . ."
(A.R. at 63).

at discretion, simple instructions, and no more than occasional fine vision acuity.  I am
not imposing a language limitation, because I am assuming . . .  that a simple job in
which he is carrying out and remembering simple instructions, is not going to require
what we consider to be sophisticated or advanced levels of English.

(*id.* at 55-56).  The ALJ clarified the English requirement:  the individual would not be required

to use English to perform the job (*id*. at 57).  The VE indicated that there were light, unskilled

jobs in the national and regional economy for a person with this background and RFC,

specifically folding laundry, sorting clothing, and operating a buffing machine (*id*. at 57).  No

jobs, however, were available if the person would be absent from work for one day a month or

was required to take four ten-minute breaks each day to elevate his feet (*id*. at 58-59).

In describing the general requirements of light work, the VE reported that the regulations

define light jobs as requiring intermittent standing or walking for six hours during an eight hour

day, with two hours of sitting or standing (*id*. at 62).  The particular jobs that he described in

response to the ALJ's hypothetical, however, required "far less" sitting and standing:  "[y]ou can

sit for four hours and you could stand for four hours" (*id*. at 62-63).  The periods of sitting and

standing can be "spaced out" throughout the day (*id*. at 72-73).

D.     The ALJ's Decision

Following the hearing on May 8, 2014, the ALJ denied Plaintiff's claim on May 16, 2014

(*id*. at 10, 19).  In determining whether Plaintiff was disabled, the ALJ conducted the five-part

analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since the alleged onset date of January 15, 2012 (*id.* at

12).  20 C.F.R. §§ 404.1571 *et seq*., 416.971 *et seq*..  At step two, the ALJ found that Plaintiff

was severely impaired due to depression, DM with peripheral neuropathy, and borderline

intellectual functioning[3] (A.R. at 13).  20 C.F.R. §§ 404.1520(c), 416.920(c).  The ALJ found

that Plaintiff's hyperlipidemia and hypertriglyceridemia and diabetic retinopathy were not severe

(A.R. at 13).[4]  Plaintiff's impairments, either alone or in combination, however, did not meet or

medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (*id.* at 16).

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform

light work,[5] with the following limitations:

> he would require a job where he could sit and stand at will, the job could require him to
> remember and carry out no more than simple instructions, and he would be required to
> perform no more than occasionally tasks requiring fine visual acuity, and he could not be
> required to communicate in English.

(*id.*).

At step four, the ALJ found that Plaintiff was not able to perform any past relevant work

(*id.*).  *See* 20 C.F.R. §§ 404.1565, 416.965.  Finally, at step five, the ALJ determined, based on

---

[3] Citing Dr. Carbone's October 2013 assessment, the ALJ noted, however, that "standardized test results varied, including some very good and some average results" (A.R. 13 n.2) (citing *id.* at 433).

[4] Christopher Symolon, O.D., who treated Plaintiff's diabetic retinopathy, described it as "mild" and indicated that there was nothing in Plaintiff's "ocular history that should limit any type of work . . . ." (*id.* at 13, 469).

[5] The Social Security Administration ("SSA") defines light work as that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing light work, [a claimant] must have the ability to do substantially all of these activities.  If someone can do light work, [the SSA] determine[s] that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567.  Plaintiff's limited visual acuity eliminated sedentary work (A.R. at 69).

the VE's testimony, that Plaintiff can perform jobs that exist in significant numbers in the

national economy taking into account Plaintiff's age, education, work experience, and RFC, and,

therefore, Plaintiff was not disabled (A.R. at 17-18).

     E.     <u>Plaintiff's Objections</u>

Plaintiff raises three objections to the ALJ's decision.  First, he criticizes the ALJ for

failing to make a function-by-function analysis to support his conclusion that Plaintiff could

stand for four hours during an eight hour day (Dkt. No. 17 at 7-9).  Next, he argues that the ALJ

violated SSR 00-4p by failing to explain the conflict between Plaintiff's language ability and the

DOT's language requirements for the three jobs that the VE opined that Plaintiff could perform

(*id*. at 10-11).  Finally, Plaintiff alleges that the ALJ erred by omitting Plaintiff's concentration,

persistence, or pace limitations from the RFC (*id*. at 11-12).  Each of Plaintiff's complaints about

the ALJ's decision will be discussed in turn.

     1.     The ALJ adequately supported his determination that Plaintiff met the
                sit/stand requirements for the three jobs identified by the VE.

Plaintiff contends that the ALJ erred by failing to perform a function-by-function analysis

of Plaintiff's ability to sit and stand as SSR 96-8p requires.  This complaint stems from some

inconsistencies in the VE's testimony concerning the amount of standing and sitting that the three

identified jobs – laundry folder, garment sorter, and buffing machine operator – required (A.R. at

15 & n.22, 17-18).  The hypothetical that the ALJ posed to the VE asked him to identify jobs that

could be performed by a person capable of light work, but with the option of sitting or standing

"for as long as, and as frequently as, he desires" (*id.* at 15 & n.22, 55, 57).  Later, during cross-

examination, the VE indicated that "even with a sit/stand option the [Plaintiff] could be required

to stand or walk [intermittently] at least 4 hours a day" in the three identified jobs (*id.* at 15 n.22,

62-63, 72-73).  The ALJ noted the apparent inconsistency between this testimony and the VE's

response to the hypothetical, but concluded that "the evidence shows the claimant would be able to sit or stand, not all at one time but intermittently, at least four hours out of an eight hour day" (*id*. at 15 n.22).  Plaintiff complains that this conclusion lacks the support of a function-by-function analysis required by SSR 96-8p.

Social Security Ruling 96-8p, which discusses the process of determining an individual's RFC, requires the RFC assessment to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before expressing RFC "in terms of the exertional levels of work, sedentary, light, medium, heavy and very heavy."  SSR 96-8p, 1996 WL 374184, at *1.  The function-by-function analysis focuses on the individual's "remaining exertional and nonexertional capacities" in view of the limitations and restrictions imposed by the medically determinable impairment(s).  *Id*. at *5.  "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands:  Sitting, standing, walking, lifting, carrying, pushing, and pulling."  *Id*.  The ruling mandates separate consideration of each of these work-related functions "even if the final RFC assessment will combine activities . . . ."  *Id*.  Based on the VE's descriptions of the jobs' requirements of sitting or standing for four hours in an eight hour day, Plaintiff's ability to sit or stand due to the medically determinable impairment of peripheral neuropathy is at issue here (A.R. at 15 n.22, 62-63, 72-73).  He does not assert any limitations on his ability to lift, carry, push, or pull.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (as long as the ALJ takes into account "those limitations for which there was record support that did not depend on [the claimant's] subjective complaints" in determining the claimant's RFC, a "function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record" was not required).

Despite Plaintiff's contrary argument, the ALJ clearly considered the relevant function-by-function assessment in crafting the RFC.  His conclusion -- that Plaintiff could sit for 4 hours and stand for 4 hours out of an 8 hour day – is amply supported by Plaintiff's medical records as well as the hearing testimony (A.R. at 15 n.22).

The ALJ correctly noted the absence of an opinion from any medical source that Plaintiff was disabled or that he was unable to "perform work activities required for any type of [substantial gainful activity]" (*id*. at 15).  *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a) (defining "medical opinions").  "The claimant is 'responsible for providing the evidence [used] to make a finding about [the RFC].'"  *Kiklis v. Astrue*, Civil Action No. 10-10699-NMG, 2011 WL 4768491, at *9 (D. Mass. Sept. 28, 2011) (quoting 20 C.F.R. § 404.1545(a)(3)).  *See Lane v. Comm'r of Soc. Sec.,* 100 Fed. Appx. 90, 95 (3d Cir. 2004) (unpublished) ("Not one of [the claimant's] treating physicians opined that she was unable to work, let alone meet the modest demands of sedentary work.  This lack of medical evidence is very strong evidence that [the claimant] was not disabled.  In fact, none of [the claimant's] treating physicians concluded that she had any work-related functional limitations.  Absent such evidence, [the claimant] cannot establish disability under the Social Security Act.") (citation omitted); *Konz v. Astrue*, Civil Action No. 09-11544-NMG, 2010 WL 5827402, at *7 (D. Mass. Nov. 8, 2010) (ALJ considered the absence of opinions from treating or examining physicians among other factors).  *Compare Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (ALJ's credibility finding was supported by the absence of "medical opinions in the record that state or imply that the claimant would have been precluded or prevented from performing the level of exertion identified").  Although Plaintiff complained of bilateral foot numbness and tingling (A.R. at 396, 400, 453-54), none of his medical providers noted that his ability to sit or stand was impaired.  *See Showell v. Colvin*,

CIVIL ACTION NO. 14-7081, 2016 WL 3599569, at *5 (E.D. Pa. July 1, 2016); *Ford v. Barnhart*, No. 04-CV-194-PB, 2005 WL 1593476, at *8 (D.N.H. July 7, 2005) ("[T]he fact that [a physician] recorded [plaintiff's] complaints in his notes does not convert her subjective complaints of pain into medical opinion, thus entitling it to some measure of deference.").

The ALJ, however, did not rely exclusively on the lack of medical opinions in assessing Plaintiff's ability to sit and stand.  Instead, the ALJ undertook a comprehensive assessment of the records of HCPA, SMA, and Dr. Courniotes and considered Plaintiff's hearing testimony in analyzing Plaintiff's ability to perform these functions and in crafting the RFC (A.R. at 13-16). These records support the ALJ's conclusion that Plaintiff could sit for four hours and stand for four hours (*id.* at 15 n.22).  In May 2012, Plaintiff's gait and station were normal despite his complaint of bilateral numbness in his feet that radiated to his calves, which he claimed to have experienced for four to five years (*id.* at 396, 398).  The sensory exam was normal to light touch and pinprick and his motor exam was normal (*id*. at 402).  Plaintiff denied having pain in his feet, even while wearing shoes (*id*. at 396).  The March 2014 report from SMA noted that Plaintiff had no leg or foot pain (*id*. at 502).  Because Gabapentin relieved the numbness in Plaintiff's feet, SMA increased the Gabapentin dosage (*id*. at 396).

Beginning in October 2012, Dr. Courniotes treated Plaintiff's recurring onchyomycosis. Plaintiff was described as "active and healthy with no apparent physical problems" during his visits in October 2012, in July, September, and November 2013, and in January and February 2014 (*id*. at 13, 308, 310, 453, 455, 457, 459).  Plaintiff walked without pain after each treatment for toenail fungus (*id*. at 308, 310-11, 453-54, 455-56, 457-58, 460).

The ALJ's finding – that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his peripheral neuropathy] symptoms are not entirely credible" – is supported

by the medical evidence, particularly Dr. Courniotes's regular observations that Plaintiff was "active and generally healthy," and by Plaintiff's consistent failure to comply with medical advice "without an adequately shown reason for doing so" (*id.* at 15, 16). "An ALJ may consider a claimant's failure to follow a prescribed treatment plan as a factor in assessing credibility." *Showell*, 2016 WL 3599569, at *5. The reports of Plaintiff's treating sources at HCPA and SMA, and the diabetes education consultant at the Mercy Medical Center are replete with references to Plaintiff's noncompliance with medical advice to check his blood sugar levels three times per day and to take his medication (A.R. at 338, 340, 342, 386, 398, 400, 410, 413, 417, 501-02). Plaintiff also ignored medical advice to stop smoking and to exercise in order to improve his condition (*id.* at 338, 340, 342). In May 2012, he smoked one pack of cigarettes per day and indicated that he had no intention of stopping, although in March 2014 he reported that he had decreased his smoking to one-half pack a day (*id.* at 340, 342, 501-02). *See Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 162 (D. Mass. 2010) ("The hearing officer made his negative credibility finding after considering all of the evidence in the record, which includes [claimant's] noncompliance with regulating his diabetes. Where a hearing officer observes and evaluates a claimant, and makes specific findings, his credibility finding is entitled to deference.") (citing *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987)).

Plaintiff's contention – that the ALJ erred as a matter of law because his decision was based on Plaintiff's noncompliance with medical advice – is not supported by the record (Dkt. No. 17 at 9). Plaintiff appears to refer to SSR 82-59, which says: "Individuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable

14

cause for the failure to follow such treatment."  SSR 82-59, 1982 WL 31384, at *1 (1982).

However, this ruling "applies only when a claimant has been determined to be disabled but for

failure to seek prescribed treatment that is expected to restore his or her ability to work." *Talgo*

*v. Astrue*, Civil No. 09-05-B-W, 2009 WL 3163335, at *3 n.5 (D. Me. Sept. 29, 2009) (citing

SSR 82-59, 1982 WL 31384, at *1).  That is not what happened here.  Instead, in undertaking the

two-step process to evaluate Plaintiff's impairment-related symptoms, specifically pain and

fatigue, the ALJ permissibly discounted the symptoms' severity after weighing the evidence of

Plaintiff's noncompliance against his testimony that described the "intensity, persistence and

limiting effects" of these symptoms (A.R. at 16).  *See Anderson v. Astrue*, No. 1:11-cv-109-

DBH, 2012 WL 283018, at *6 (D. Me. Jan. 30, 2012) ("SSR 82–59 does not bar the

administrative law judge from having taken . . . evidence [of claimant's failure to follow medical

advice] into account in the context of his credibility assessment."); SSR 16-3P, 2016 WL

1119029, at *1, *8 (Mar. 16, 2016) (supersedes SSR-96-7p) ("[I]f the individual fails to follow

prescribed treatment that might improve symptoms, [the Commissioner] may find the alleged

intensity and persistence of an individual's symptoms are inconsistent with the overall evidence

of record.").  The ALJ questioned Plaintiff about his reason for noncompliance, as required (A.R.

at 35-36).  *See* SSR 16-3P, 2016-WL 1119029, at *8.  The ALJ found that Plaintiff's stated

reason -- the medication did not help -- did not justify his failure to follow the prescribed

treatment (*id.*).

    Because the ALJ correctly considered Plaintiff's noncompliance with medical advice and

his reasons therefore, along with the other medical evidence, in assessing the degree to which

Plaintiff's symptoms limited his functioning, there is substantial evidence to support the ALJ's

decision that Plaintiff is not disabled.  Plaintiff presents no basis to disturb the ALJ's determination.

> 2.      The VE's testimony provided substantial evidence to support the ALJ's determination at step five that Plaintiff could perform the three jobs described by the VE, which did not require Plaintiff to communicate in English, and there was no conflict between the VE's testimony and the DOT that the ALJ was required to resolve.

Plaintiff contends that the ALJ erred by basing his step five determination on the VE's testimony without explaining and resolving the conflict between the VE's opinion that Plaintiff could perform three jobs and the DOT's definitions of these jobs (Dkt. No. 17 at 10).  *See Auger v. Astrue*, 792 F. Supp. 2d 92, 95 (D. Mass. 2011) (quoting SSR 00-4p, 2000 WL 1898704, at *2).  Specifically, Plaintiff argues that the ALJ failed to resolve the discrepancy between his illiteracy and the VE's opinion that he would be able to perform three unskilled jobs -- laundry folder,[6] garment sorter,[7] and buffing machine operator[8] -- which the DOT classified as Language Level 1 or Level 2 positions, essentially requiring the ability to read and write (A.R. at 17-18, 57).

"The DOT is """a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy."""

---

[6] The job of laundry folder is listed in the DOT as occupation 369.687-018.  *See* DOT 369.687-018.  The DOT lists this job as requiring Language Level 1.  *Id.*  Without citation to the record, Plaintiff lists this job as DOT 369.387-010, Laundry Worker II, which the DOT describes as a Language Level 2 job (Dkt. No. 17 at 10).  If this is one of the positions, it does not change the court's analysis.

[7] The job of garment sorter is listed in the DOT as occupation 222.687-014 with a Language Level 1 requirement.  *See* DOT 222.687-014.

[8]      The occupation of buffing machine operator is listed in the DOT as occupation 603.382-010 with a Language Level 2 requirement.  *See* DOT 603.382-010.

*Downs v. Colvin*, Civil No. 14-cv-319-LM, 2015 WL 3549322, at *6 n.7 (D.N.H. June 8, 2015)

(quoting *Frasier v. Colvin*, No. 9:12-cv-01947-DCN, 2014 WL 526400, at *20 n.17 (D.S.C. Feb.

10, 2014)).

> Each job listed in the DOT carries with it a set of three [general educational development ("GED")] requirements, one each for reasoning development, mathematical development, and language development.  In each area of development, the DOT rates the level required for any particular job on a scale of one through six, with one being the lowest.

*Id.* at *6.  In the area of language development in the DOT, Language Level 1, the lowest level,

includes requiring a person to "[r]ecognize [the] meaning of 2,500 (two or three syllable) words";

"[r]ead at a rate of 95-120 words per minute"; "[p]rint simple sentences containing subject, verb,

and object . . ."; and "[s]peak simple sentences, using normal word order . . . ."  DOT, Fourth

Edition, Revised 1991, App. C, 1991 WL 688702.  Language Level 2 requires a higher skill

level.  *Id.*

At step five of the five-step inquiry, the Commissioner has the burden of demonstrating

that, given the claimant's age, education, work experience, and RFC, he can perform specific

jobs in the national economy.  *See Heggarty v. Sullivan*, 947 F.2d 990, 995 (1st Cir. 1991);

*Goodermote*, 690 F.2d at 7; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ consults

either the DOT or a VE to obtain occupational information.  *See* SSR 00-4p, 2000 WL 1898704,

at *2.  If an ALJ relies on a VE's testimony to support the step five determination, SSR 00-4p

requires the ALJ to "[i]dentify and obtain a reasonable explanation for any conflicts between

occupational evidence provided by [the VE] . . . and information in the [DOT] . . . and [e]xplain

in the determination or decision how any conflict that has been identified was resolved."  SSR

00-4p, 2000 WL 1898704, at *1.  "Courts in this circuit have interpreted SSR 00-4p to require

the ALJ to inquire whether a VE's testimony conflicts with the DOT and explain the resolution

of any apparent conflict in the decision." *Hargrow v. Colvin*, Civil Action No. 13-10170-DJC, 2014 WL 1153782, at *15 (D. Mass. Mar. 19, 2014).

At the beginning of the VE's hearing testimony, he indicated that he would inform the ALJ if he identified jobs with descriptions that were inconsistent with the DOT's (A.R. at 54-55). *See* SSR 00-4p, 2000 WL 1898704, at *2. The VE heard Plaintiff testify that he had been in the United States for more than twenty years, and had manufactured computer cables for about eighteen years with the assistance of another employee who translated instructions from English to Vietnamese (A.R. at 28, 29-30, 54, 56). The VE testified that Plaintiff's manufacturing positon was a "skilled job," the highest skill level recognized by the Commissioner (*id*. at 55). *See* SSR 00-4P, 2000 WL 1898704, at *3. In the RFC and in the hypothetical question that the ALJ posed to the VE about job availability, the ALJ recognized Plaintiff's language limitations (A.R. at 16, 57). Specifically, the ALJ asked the VE to identify jobs that could be performed by a person who would be 50 years old in seven months, had Plaintiff's education and work experience, and Plaintiff's RFC for light work except with limitations, including the inability to communicate in English (*id.*). The VE responded by proffering the three unskilled positions that could be "taught by demonstration" and did not require the ability to communicate in English (*id*. at 56-57). Citing SSR 00-4p, the ALJ determined at step five that the VE's testimony was consistent with the information in the DOT (*id*. at 18).

The Commissioner does not dispute that the DOT's definitions of the jobs the VE proffered were either Language Level 1 or Level 2 jobs, but argues that by including Plaintiff's language limitations in the hypothetical, the ALJ resolved any discrepancy between the VE's opinion and the DOT's descriptions (Dkt. No. 28 at 12). Based on the difference between the

general information in the DOT and the more tailored information about specific occupations
that the VE offered here, the Commissioner's argument is persuasive.

"The DOT lists maximum requirements of occupations as generally performed, not the
range of requirements of a particular job as it is performed in specific settings.  A VE . . . may be
able to provide more specific information about jobs or occupations than the DOT."  SSR 00-4p,
2000 WL 1898704, at *3.  "In other words, the DOT classification serves as a [language] level
ceiling, and not as a floor."  *Pacy v. Colvin*, Civil No. 15011894-LTS, 2016 WL 1948834, at *4
(D. Mass. May 3, 2016).  If a VE identifies a specific job that falls within the DOT's description
that can be performed by an individual with lower language ability than the maximum stated in
the DOT, there is no conflict between the VE's opinion and the DOT.  *See id.* (finding "no
conflict between the DOT listing and the VE testimony" despite the difference between the
DOT's reasoning level for identified jobs and plaintiff's RFC because the VE opined that plaintiff
could perform the three jobs that he identified).

Here, in response to the ALJ's hypothetical, which included Plaintiff's inability to
communicate in English, the VE identified three jobs that Plaintiff could perform (A.R. at 16-18,
57).  He did not point to any inconsistencies between the requirements of these particular jobs
and the DOT's job descriptions, despite his agreement to do so at the beginning of his testimony
(*id.* at 54-55).  Accordingly, there was no inconsistency that the ALJ was required to identify and
explain.  *See Hargrow*, 2014 WL 1153782, at *16-17 (finding no apparent conflict between the
VE's testimony about the reasoning requirements of identified jobs and the DOT's higher
requirements due to the VE's knowledge of the specific requirements of the identified positions
and his failure to acknowledge that his testimony conflicted with the DOT's despite agreeing to
do so).  *Compare Burton v. Astrue*, No. 2:11-cv-174-GZS, 2012 WL 1184425, at *3 (D. Me.

Apr. 6, 2012) (remanding for resolution of the conflict between the VE's opinion and the DOT where the ALJ failed to ask the VE whether a person who was functionally illiterate in reading could perform any of the identified jobs); *Omar v. Astrue*, Civil No. 08-270-P-S, 2009 WL 961230, at *4-5 (D. Me. Apr. 7, 2009) (finding a conflict between the VE's testimony and the DOT due to the ALJ's failure to include in his hypothetical claimant's inability to communicate in English, but holding the error was harmless).

Additionally, Plaintiff's suggestion -- that illiterate claimants cannot perform any jobs and are per se disabled -- is contrary to settled law. "[T]he DOT does not preclude illiterate individuals from performing level 1 language jobs, otherwise illiteracy would be a per se disability." *Johnson v. Astrue*, No. C 12-01580 PJH, 2013 WL 3956248, at *12 (N.D. Cal. July 30, 2013), *aff'd sub nom Johnson v. Colvin*, 623 F. App'x 326 (9th Cir. 2015). *See also Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (holding that a claimant's illiteracy did not mean he was per se disabled); *Downs*, 2015 WL 3549322, at *11 ("[I]lliteracy is not a categorical bar to the performance of jobs requiring level-one language development."); *Warf v. Shalala*, 844 F. Supp. 285, 289-90 (W.D. Va. 1994) (rejecting the argument that would make illiteracy a disability per se). Plaintiff's inability to communicate in English did not preclude his performance of the light, unskilled jobs that the VE identified (A.R. at 16, 57). *See Omar*, 2009 WL 961230, at *4 ("For jobs at the light exertional level, the regulations make clear that inability to communicate in English does not preclude a finding that the claimant is not disabled."); Section 202.00(g), Appendix 2 to Subpart P, 20 C.F.R. Part 404 (literacy or the ability to communicate in English has the "least significance" for unskilled jobs).

Because the VE's opinion that Plaintiff could perform three jobs did not conflict with the DOT's job descriptions, the VE's opinion serves as substantial evidence to support the ALJ's

step-five determination that Plaintiff was not disabled.  *See Sousa v. Astrue*, 783 F. Supp. 2d 226,

235 (D. Mass. 2011) ("The opinion of a vocational expert that a Social Security claimant can

perform certain jobs qualifies as substantial evidence at the fifth step of the analysis.").

If there was an unresolved conflict between the VE's testimony and the DOT's definition

of the jobs he proffered, given Plaintiff's previous long-time occupation in a skilled job despite

his language limitations, the VE's explanation that the three light, unskilled jobs that he

identified could be taught by demonstration, and the VE's identification of at least one of these

jobs as requiring Language Level 1, meaning that literacy was not required, there was substantial

evidence to support the ALJ's decision and any error was harmless.  *See McGrath v. Astrue*, Civil

No. 10-cv-455-JL, 2012 WL 976026, at *10 (D.N.H. Mar. 22, 2012) ("'A single occupation is

sufficient to meet the commissioner's burden' at Step 5 of the evaluation process.") (quoting

*Welch v. Barnhart,* No. 02–247–P–C, 2003 WL 22466165, at *4 (D. Me. Oct. 31, 2003)).

Accordingly, remand is not warranted.

      3.     The RFC adequately addressed Plaintiff's limitation in maintaining
                 concentration.

Finally, Plaintiff contends that the ALJ failed to include in the RFC his deficits in

maintaining concentration, persistence, or pace due to depression (Dkt. No. 17 at 11-12).

Plaintiff's argument fails because the RFC reflected Plaintiff's single deficit that was supported

by the medical evidence:  his occasional inability to concentrate.

The ALJ considered only Dr. Carbone's reports on the issue of Plaintiff's mental

impairments (A.R. at 14, 16).[9]  The ALJ accorded Dr. Carbone's assessment "moderate weight,"

---

[9] In May and October 2013, non-examining state consultants completed the Psychiatric Review
Technique ("PRT") forms based on Plaintiff's medical records (A.R. at 78-79, 117-18).  The first
evaluator found that Plaintiff had "mild" difficulties in maintaining concentration, persistence, or
pace, while the second evaluator determined that he had "moderate" difficulties (*id.* at 78, 118).

although the ALJ noted that neither Dr. Carbone, nor any other medical care provider, opined

that Plaintiff was disabled or unable to work (*id.* at 15).  Dr. Carbone's October 2013

reevaluation of Plaintiff noted "some depression related to his current health situation," which

caused occasional memory limitations attributable to difficulty concentrating (*id*. at 434).

However, Dr. Carbone also observed that Plaintiff's "memory for tasks and recent events

appeared to be intact" and "there was no evidence of significant memory difficulties" (id. at 433,

434).  Dr. Carbone did not mention any deficits in Plaintiff's ability to maintain persistence or

pace (*id*. at 430-434).  Plaintiff's GAF score of 62 indicates "some mild symptoms . . . and no

more than slight impairment in social, occupational, or school functioning" (*id*. at 434).[10]  *Boston*

*v. Astrue*, Civil No. 10-cv-00250-PB, 2011 WL 2491120, at *5 n.14 (D.N.H. June 22, 2011)

(citing *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000)).

At step two of the sequential evaluation, the ALJ applied the "special technique" that 20

C.F.R. § 416.920a required by considering the so-called "paragraph B criteria," found that

Plaintiff's depression imposed no limitations on his daily living or ability to socialize, but

imposed moderate limitations on his ability to maintain concentration, persistence, and pace, and

concluded that Plaintiff's depression was severe (A.R. at 17).[11]  At step three, the ALJ found that

---

The ALJ accorded the non-examining state reviewers' opinions "no weight" because their findings were inconsistent with the opinions of the medical professionals who examined Plaintiff (*id.* at 16).

[10] "[T]he American Psychiatric Association has moved away from the GAF system in recent years.  The newest version of the Diagnostic & Statistical Manual of Mental Disorders, published in May 2013, no longer uses the GAF score." *King v. Colvin*, 128 F. Supp. 3d 421, 439 (D. Mass. 2015).  "The [SSA], however, has indicated that it will continue to consider GAF scores in disability cases."  *Id.* at n.17.

[11] The following five point scale is used to rate these functional areas, referred to as the "paragraph B criteria":  none; mild; moderate; marked; and extreme.  *See* 20 C.F.R. § 416.920a(c)(4).

Plaintiff's depression did not meet or equal the severity of any impairment listed in the regulations (*id.*).  *See* 20 C.F.R. § 416.920a(b)-(c), (d)(2).  Before proceeding to steps four and five, the ALJ incorporated Plaintiff's minimal memory impairment into the RFC by limiting light work to jobs that "could require him to remember and carry out no more than simple instructions" (A.R. at 16).  *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 183 (D. Mass. 2015) ("'[T]he hypothetical posed to a [vocational] expert must include all of the claimant's relevant impairments.'") (quoting *Aho v. Comm'r of Soc. Sec. Admin.*, Civil Action No. 10-cv-40052-FDS, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011)).  In fact, "it is debatable whether the RFC must necessarily include the paragraph B criteria of moderate difficulties in concentration, persistence or pace that an ALJ determines at step three."  *Dias,* 52 F. Supp. 3d at 285 (citing *Beasley v. Colvin,* 520 Fed. Appx. 748, 754–55 (10th Cir. 2013) (unpublished)).  Plaintiff got more than that to which he was entitled.

> The mental capabilities required for unskilled work are described as follows:
>
> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, *carry out, and remember simple instructions*; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85–15, 1985 WL 56857, at *4 (1985) (emphasis added).  Courts of the First Circuit have recognized that an RFC like Plaintiff's, which specifically limits the claimant to work that involves remembering simple instructions, like unskilled work, adequately addresses memory and concentration deficits (A.R. at 16).  *Compare Rivera v. Colvin*, Civil No.: 14-1706 (MEL), 2016 WL 1255709, at *3 (D.P.R. Mar. 30, 2016) ("Although the ALJ did not specifically mention either attention or concentration, claimant's difficulties in this regard are subsumed within the ALJ's expression that claimant can execute simple tasks."); *Casiano-Vargas v. Comm'r of Soc. Sec.*, Civil No. 14-1418 (MEL), 2015 WL 3932471, at *4 (D.P.R. June 26, 2015)

(same); *Perry v. Astrue,* Civil Action No. 11-40215-TSH, 2014 WL 4965910, at *6 (D. Mass.
Sept. 30, 2014) ("A finding of moderate limitations in maintaining concentration, persistence, or
pace, does not necessarily preclude the performance of unskilled work.").

Plaintiff's reliance on the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th
Cir. 2015), is unavailing.  In *Mascio*, the medical evidence indicated that plaintiff had moderate
limitations in her ability to maintain concentration, persistence, and pace.  *Id*. at 638.  The RFC
addressed Mascio's limitations only by incorporating unskilled work.  *Id.*  In remanding to the
ALJ to explain why his finding of moderate limitations in concentration, persistence, and pace at
step three did not translate into limitations in the RFC that specifically addressed plaintiff's
deficits in these areas, the court held that "the ability to perform simple tasks differs from the
ability to stay on task.  Only the latter limitation would account for claimant's limitation in
concentration, persistence, or pace." *Id.*  In the instant case, by contrast, Plaintiff's RFC
adequately addressed the only mental health deficit that Dr. Carbone's reports identified (A.R. at
16, 434).  *See St. Clair v. Colvin*, Civil Action No. 7:13cv00571, 2015 WL 5310777, at *16
(W.D. Va. Sept. 11, 2015) (holding Post-*Mascio* that "[a]n ALJ may account for a claimant's
limitation with concentration, persistence, or pace by restricting the claimant to simple, routine,
unskilled work where the record supports this conclusion, either through physician testimony,
medical source statements, consultative examinations, or other evidence that is sufficiently
evident to the reviewing court").

Likewise, *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011), is
distinguishable because, there, the ALJ's determination that Plaintiff had moderate limitations in
concentration, persistence, or pace were not reflected in the RFC or the hypothetical questions
that the ALJ posed to the VE.  *Id.* at 1180-81.  Here, however, the RFC accounted for Plaintiff's

memory limitations (A.R. at 16).  *See Winschel,* 631 F.3d at 1180 ("[W]hen medical evidence

demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite

limitations in concentration, persistence, and pace, courts have concluded that limiting the

hypothetical to include only unskilled work sufficiently accounts for such limitations."); *see also*

*Newcomb v. Colvin*, No. 2:15-cv-463-DBH, 2016 WL 3962843, at *7 (D. Me. July 22, 2016)

(rejecting claimant's argument, based on *Mascio* and *Winschel*, that a restriction to simple tasks

or unskilled work to address a moderate limitation in maintaining concentration, persistence, or

pace is per se reversible error and holding that the ALJ adequately addressed claimant's

limitations in these areas).[12]

Substantial evidence in the record supports the limitations contained in the RFC and

remand is not necessary.

V.    CONCLUSION

For the reasons stated above, Plaintiff's Motion for Judgment on the Pleadings  (Dkt. No.

16) is DENIED, and the Acting Commissioner's Motion to  Affirm the Decision (Dkt. No. 27) is

GRANTED.

It is so ordered.

Dated:  December 5, 2016                                    /s/ Katherine A. Robertson
                                                           KATHERINE A. ROBERTSON
                                                           United States Magistrate Judge

[12] Plaintiff also mentions his alleged "fatigue" and "need to take breaks" due to pain in support of his argument that the ALJ failed to account for his limitations in concentration, persistence, or pace (Dkt. No. 17 at 12).  As discussed earlier, the ALJ did not credit Plaintiff's account of the severity of his fatigue and pain.